Evidence from a comparison of handwriting, supported by other circumstances, is admissible. On the same principle,

## M'CORKLE *against* BINNS.

THIS was an action on the case against the defendant, for two libels published in his gazette, the *Democratic Press*, on the 9th and 16th of *September* 1808, against the plaintiff, who was editor of a gazette called the *Freeman's Journal.*

from a comparison of the types, devices &c. of two newspapers, one of which is clearly proved, and the other imperfectly, the jury may be authorized to infer that both were printed by the same person.

To print and publish of *A*, " that he has been deprived of a participation of the chief " ordinance of the church to which he belongs, and that too by reason of his infamous, " groundless assertions," is a libel.

So is any malicious printed slander which tends to expose a man to ridicule, contempt, hatred, or degradation of character.

If after a jury are sworn, and before the verdict, one of the parties learns that a juror before he was impannelled, declared that he had made up his mind against him, he must make it known at once, if he intends to rely on it. He must not take the chance of a verdict in his favour, and upon its being the other way, move for a new trial upon the declarations of the juror.

The juror implicated, may be examined to shew that he did not make the declarations imputed to him; but neither he, nor any of the jurors can be asked, whether he was not in favour of the lowest sum that had been named for damages by any of the panel.

The declaration contained three counts. In the first and second the same publication was laid different ways. It was as follows: " But what will not ambition and revenge des-" cend to? Who could expect better from such a quarter? " Was not the envenomed simpleton, who professes to be " the editor of that paper, *deprived of a participation of the* " *chief ordinance of the church to which he belongs, and that* " *too by reason of his infamous and groundless assertions?* " Were it not for the lenity of some, this *public pest* would " long since have been silenced; but the day is not far dis-" tant, when the deep toned bell, will toll the exit of his " paper." The third count, set out the publication in the paper of the 16th of *September*, which was as follows: " Cer-" tificates of religion. Of late we have had a display of cer-" tificates to prove that *Wm. M'Corkle* has been in full stand-" ing and communion with the church for some years. I " deny the truth of the assertion, and affirm that the certifi-" cates he has produced, do not prove it. And I further " affirm, that *he has been deprived of his full standing, and of* " *partaking in communion, because of his groundless and in-* " *famous assertions.* I do not affirm that he has been thus " deprived of partaking in communion, by any regular act of " the regular officers of the church of which he is a member; " but do distinctly and decidedly affirm, that he has absent-" ed himself from the table, and thus prevented the session " from being called to investigate his conduct."

The cause was tried under the plea of Not Guilty, with leave &c. before *Brackenridge* J. at a Nisi Prius in the last month, when the jury found a verdict for the plaintiff, 500 dollars damages; and now upon a motion for a new trial, which was accompanied by a motion in arrest of judgment, the material facts were reported as follows:

For the purpose of proving the papers, the plaintiff called *William T. Donaldson*, who stated that he was a subscriber to the *Democratic Press*, and the defendant was the editor of it. The papers were left daily at *Donaldson's* house by one of the defendant's carriers, and it was his custom to have them filed by a clerk, and preserved. A number of them had been thrown into an upper room, in which lumber was kept. The plaintiff came to *Donaldson's* house after this action was commenced, and being informed that he

filed his papers, asked permission to search for those he wanted, and went up with *Donaldson* for that purpose. After being there for some time, the plaintiff said to the witness, that it was cold, and there was no occasion for him to take the trouble of staying; that he might go down stairs, and the plaintiff would continue the search. *Donaldson* went down, and sometime after the plaintiff came to him with a file of papers which *Donaldson* believed to be his own; and at the request of the plaintiff wrote his name on the papers of the 9th, 12th and 16th of *September* 1808. The witness did not perceive that the plaintiff had taken up any papers with him. The room was open to *Donaldson's* family; and he had not been in it perhaps for a month before. He knew the defendant to be the editor of the *Democratic Press* by general reputation, and by having given him an advertisement, which he promised to insert in the paper, and which was accordingly inserted, and paid for to the clerk of *Binns* in his presence. The witness subscribed for the paper at the same time.

His Honour, against the consent of the defendant's counsel, permitted this evidence of publication to go to the jury.

Another witness was called by the plaintiff, and proved that he had bought a paper of the 16th of *September* 1808, then produced, at the defendant's office. This paper also went to the jury; and in his charge, the judge told them, that they might compare the types, devices &c. on this, with the two papers found in *Donaldson's* house, for the purpose of ascertaining the authenticity of the latter.

Several reasons were assigned for a new trial, and one in arrest of judgment. Of the former, those that were pressed in the argument were, 1. That one of the jurors declared before the trial, that he had made up his mind against the defendant, and if called on the jury, that he would inform the Court of it. 2. That the Court erred in permitting the newspapers to go to the jury upon insufficient evidence of their publication by the defendant. 3. That the Court also erred in permitting the jury to form a judgment by comparison of newspapers. The motion in arrest of judgment, was that the publications in question were not libellous.

In support of the first reason for a new trial, the defendant's counsel called a witness named *Jonathan Carson*,

who swore that on the evening of the day when the trial was called on, the sheriff' officer, who was summoning *tales* men, came to him and ordered him not to leave the court. *George Summers*, the juror in question, then came up to the witness, who told him he would soon be caught. In two or three minutes *Summers* was summoned. He then observed to the witness, *that it was of no use to take him*, *he had made up his mind against Binns. Binns has published a libel on religion, and I will give my verdict against any man who publishes a libel on religion, and I will inform the Court so, if I am impannelled on the jury.* The witness said that *John Wagner* was present about the time, and near enough to hear. The next day after the jury were sworn, *Carson* said he mentioned it in *Rubicam's* tavern in the presence of several persons. He also mentioned it to Mr. *Browne*, one of the defendant's counsel, before the verdict was given in. [The defendant knew it after the jury had retired, and before they returned.]

*Lambert Smith* swore that he was present at *Rubicam's*, while the trial was going on, and heard *Carson* state what he had since sworn in court. *Summers* was as respectable as any man, in his opinion, and *Carson* was also a reputable man.

*John Wagner* swore that he was in court at the time alluded to, but did not recollect seeing *Carson* there. He saw *Summers* in court, but did not recollect having any conversation with him upon the subject of this suit.

The plaintiff's counsel then called Mr. *Summers;* but he was objected to, on the authority of *The Lessee of Cluggage* v. *Swan* (a), he being the party charged with improper conduct. A juror should not be permitted either to impugn or support his verdict.

On the other hand it was said, that though he could not impugn, he might be examined to support the verdict. *Dana* v. *Tucker* (b). Any verdict might be avoided, if the rule were otherwise.

TILGHMAN C. J. The Court see no objection to examining the juror. He is a legal witness. He is in nowise inte-

(a) 4 *Binn.* 150.　　　　(b) 4 *Johns.* 487.

VOL. V.　　　　2 X

1812.

M'CORKLE
v.
BINNS.

rested; and to reject him would be perhaps to exclude the truth. Where a matter of fact is brought before the Court, they must try it; and if the case requires it, they must judge of the credibility of witnesses. It is impossible to decide in any other manner.

*George Summers* then swore, that he was a talesman in this cause. That he had not been in court more than half a minute when he was summoned. Mr. *Mitchell* who was standing by, said, you are caught. *Summers* replied, that he did not believe either *Binns* or *M'Corkle* would have him on the trial, that he supposed it was a political trial, and he did not believe that either had much regard for his politics. *He did not know then that the cause of action was on account of religion, nor did he know it until it was opened by counsel after the jury were sworn. He did not tell* Carson *that he had made up his mind against* Binns, *nor that he would tell the Court so, nor that he would find a verdict against any man who published against religion.*

The plaintiff's counsel then proposed to ask Mr. *Summers*, whether he had not been for the lowest damages of any of the jury: But the Court overruled this question, and would not permit it to be put to other jurors who were attending. The Chief Justice said he *thought it unnecessary* in this case, and the other judges said that it was wrong on principle, to inquire into the proceedings of the jury, by questions to the jurors themselves.

*C. J. Ingersoll* for the defendant. 1. The evidence that we have given of the juror's declarations is positive; that of the juror is negative, and proceeds from an interested quarter. The former cannot be false without perjury; the latter may be. The Court will therefore suppose the declarations to have been made; and as they would have been a ground of challenge before the juror was sworn, and are decisive evidence that the juror did not stand indifferent, a new trial should be granted. The precise point in this case was ruled in *Harding's Kentucky Rep.* 167.

2. The papers were not duly proved, when the judge gave them to the jury. Their identity with those which *Donaldson* received from the editor, was in no respect established.

Until that was done, it was no more, than giving a paper in evidence, without a particle of proof that the defendant had published it, which would have been clearly erroneous.

3. The comparison of newspapers was never before stated as a ground to infer authorship. Types and devices may be imitated so as to escape detection. Even comparison of handwriting will not do; but this is infinitely less.

4. The narr contains no libel. To say or write any thing concerning ecclesiastical affairs is not actionable, unless the party spoken of gets his living by the church, or receives special damage, which is laid in the declaration. Scandals which concern matters merely spiritual, are in *England* cognizable only in the Ecclesiastical Court. 3 *Bl. Com.* 125. The common law does not notice them. Our own law emphatically disregards them, because it permits an unbounded liberty in religious opinions. It neither requires nor protects particular doctrines, and of course cannot take notice of a privation of religious privileges, nor consider it as an injury to character. The whole controversy is ecclesiastical. The secular arm cannot punish nor terminate it.

*M'Kean* for the plaintiff. 1. The fact of the declarations is clearly disproved. The Court cannot but perceive there is error on one side, and until further proof is brought, the party impeached must be deemed innocent. But if the words were used, the defendant knew it before the verdict, and should immediately have communicated it to the Court. He cannot take the chance of a verdict, and endeavour to defeat it when it is against him.

2. The proof of the papers was sufficient to go to the jury. Every fact was distinctly shewn, except the negative that the defendant or some other person, had not interpolated the papers in question. This was a matter for the jury to decide; and inasmuch as the defendant could have shewn to a demonstration, that he did not print such papers, if that had been the fact, the absence of that proof concluded the matter. Much less than this has been held sufficient evidence of the publication for the jury. *Peake's Ev.* 308. *Baldwin* v. *Elphinston* (a), *M'Nally* 642. ch. 32., 4 *Bac. Abr.* 458. *Libel. B.* 2. *King* v. *Almons* (b).

(a) 2 *W. Black.* 1037.          (b) 5 *Burr.* 2687.

1812.

M'CORKLE
v.
BINNS.

3. Comparison of handwriting is a ground of judgment, and a species of evidence, when supported by other circumstances. So are types and devices. If the defendant can rebut, let him. Publication was a fact, and the jury had a right to weigh the resemblance, as a circumstance. This was all the Court authorised them to do. 3 *Selw. N. P.* 930. 933.

4. That this is a libel no man can doubt. Any malicious defamatory writing, tending to expose one to ridicule, hatred or contempt, is a libel. 4 *Black. Com.* 150., 3 *Selw. N. P.* 925., 1 *Hawk.* ch. 73. sec. 1. 3. 4. 10., 4 *Bac. Abr. Libel.* 450. O. 2. *Villers* v. *Monsly* (a). It is not possible that any man can be driven from the chief ordinance of his church, for infamous and groundless assertions, or in consequence of those assertions be forced to fly from an investigation, without losing his character; and it is this which is falsely charged against the plaintiff. The offence has nothing ecclesiastical about it. It is true that it consists in charging the loss of standing in the church; but the cause assigned is infamous falsehoods. To publish in writing of a man that he is an infamous liar, is a libel. This is the same thing, with conviction and degradation added.

*Browne* in reply, said he would leave the motion in arrest of judgment, upon the argument of his colleague.

On the first reason for a new trial, he remarked that if the Court had any doubt, they ought to grant the motion, because the plaintiff would not be injured by that course, and the defendant might suffer by a contrary one. The fact of his knowledge before the verdict was immaterial, because the time for challenging had gone by. A cause of challenge not known, is cause for a new trial. 6 *Bac. Abr.* 661. *Trial L.* 4., 3 *Bac. Abr.* 756. *Jury E.* 5.

On the second, he contended that until the publication was proved, the paper could not be read. The judge must therefore decide the question of publication in the first instance. Here the essential fact, the identity of the papers, was left to the jury; but until that identity was proved, the jury had no right to hear the papers.

On the third point, he argued that the comparison of types

(a) 2 *Wils.* 403.

was infinitely too slight a basis for the judgment of a jury to be formed upon it. It would be a rash judgment. Handwriting has a peculiar character, which none but the author can give to it; types and devices are the fruit of an art, which can reproduce the same character *ad infinitum.* The former is never relied on, but when powerfully corroborated; the latter has no weight whatever.

TILGHMAN C. J. This is an action for two libels published by the defendant in a newspaper called, " *The Democratic Press,*" of which he is the editor and proprietor, on the 9th and 16th of *September* 1808. Motions have been made by the defendant for a new trial and in arrest of judgment. There were five reasons for a new trial filed, but as some of them were abandoned, I shall consider those only which were insisted on. These may be reduced to three heads. 1st, That one of the jurors declared, before he was impannelled, that he had made up his mind against the defendant. 2d, That the judge who tried the cause erred in law, in permitting the newspapers to be read to the jury. 3d, That he erred in suffering the jury to form a judgment by comparing one paper with another.

1. There is no occasion to consider the *law* on the first point, because I do not think the defendant has established the fact. It was sworn indeed by one witness, *Jonathan Carson,* that after *George Summers* had been summoned as a talesman, he heard him say, that " it was of no use to take " him, as he had made up his mind against *Binns;* that *Binns* " had published a libel against religion, and he would give " his verdict against any man who published a libel against " religion, and that he would inform the Court of his opi- " nion, if they went to impannel him on the jury." In cor- roboration of *Carson's* evidence, it was proved by *Lambert Smith,* that during the trial he heard *Carson* say, substanti- ally, the same thing that he has sworn, at *Rubicam's* tavern, in the presence of ten or a dozen people. On the other hand *Summers* swore that he never said any such thing, and that in fact so far from having made up his mind, he did not know what the cause of action was until after he was impan- nelled; and he stands corroborated by this circumstance, that he did not say any thing to the Court of his having formed

an opinion on the subject. I am loth to impute perjury to any man where there is a possibility of mistake. It is possible, that in a crowded court house, *Carson* might have mistaken something which he supposed to have fallen from *Summers.* But I do not conceive it possible that *Summers* can be mistaken as to his having made up his mind against the defendant. It appears that they are both men of good character. ·All that I can say therefore is, that it is an extraordinary affair, but I do not consider the fact set up by the defendant as sufficiently established. There is another circumstance which would make me incline against a new trial on this point. It does not appear at what precise time, this matter first came to the knowledge of the defendant or his counsel; but it is very certain that it was *before the verdict.* Now if the defendant supposed that he should not have a fair trial, he ought to have laid the matter immediately before the Court, and requested that the jury might be discharged. He ought not to have taken the chance of a verdict in his favour, and kept his motion for a new trial in reserve; because the plaintiff and defendant were then placed on an unequal footing. I mention this for the direction of those, who may happen to be in like circumstances in future.

2. In order to understand the second and third points, it will be necessary to take a view of the evidence, [which the Chief Justice accordingly stated.] If the judge had been satisfied that the papers were not identified, he might have withheld them from the jury; but considering it as a doubtful matter, I cannot say that he was wrong in submitting it to the jury. It was possible that the plaintiff might have inserted a paper of *his own*, in the file which he found upstairs; but enough had been shown to authorise the Court to submit the matter to the jury. It is like the common case of a deed which is not immediately in issue, being offered in evidence. If the Court think it not sufficiently proved, they may refuse to suffer it to be read. But if the evidence in favour of it has any considerable weight, they may and generally do leave it to the jury.

3. Besides the paper of the 16th of *September* found in *Donaldson's* house, there was another of the same date given in evidence, which was proved to have been purchased from the defendant's shop. This being identified beyond all

doubt, the judge told the jury that they might compare the type, devices &c. on this, with the two papers found in *Donaldson's* house. The defendant's counsel say this was wrong, because proof by comparison of *handwriting* is not legal, and *à fortiori* proof by comparison of *types* &c. If comparison of hands were in no case legal evidence, it would operate strongly in favour of the defendant's argument; but I do not take the law to go so far. After evidence has been given in support of a writing, it may be corroborated by comparing the writing in question, with other writing concerning which there is no doubt. The law is so laid down in *Peake* 104, who says, " that the courts of justice have wisely rejected " all evidence from mere comparison of hands, unsupported " by other circumstances." Some of the old books give us a reason for not submitting comparison of hands, that perhaps some of the jury cannot write. But when they *can all write*, that reason has no weight; and I believe it is very rare indeed at this time of day, to find a juryman in this city who cannot write. If the discovery of truth is the object of evidence, it must be confessed, that in doubtful cases the jury, after hearing other testimony, may be much assisted by a comparison of hands. On the same principle I think that a foundation being first laid, the jury may be permitted to compare the types, devices &c. of newspapers. In general such evidence would not be very strong. But cases may occur in which a comparison would be decisive.

The motion in arrest of judgment remains to be considered. It has been contended for the defendant that the matter complained of is not a libel. If it be not, it seems to me, that it is no easy matter to compose a libel. Let us see what it is that the defendant has inserted in his paper. He charges the plaintiff, " with having been deprived of a participation " of the chief ordinance of the church to which he belongs, " and that too, by reason of his *infamous* and *groundless as-* " *sertions*." The distinction between slander by words, and by printing or writing, is so well known, that it is unnecessary to dwell on it. Suffice it to say, that any malicious *printed* slander, which tends to expose a man to ridicule, contempt, hatred or degradation of character, is a libel. But say the counsel for the defendant, no man's character suffers in *Pennsylvania* by an exclusion from the rites of the church

to which he belongs, because by our constitution the only test for opening the door to honour and office is, " a belief " in one Supreme Being and a future state of rewards and " punishments." But how does that bear upon the question? The plaintiff is not charged merely with a voluntary absti- nence from the principal sacrament of his church, or being deprived of that sacrament for any innocent or meritorious action, but with an expulsion from it on account of his *infa- mous unfounded assertions.* To say of a man in a newspaper, that he is guilty of *infamous falsehoods* is clearly a libel; and is it less so, because the elders of his church have found him guilty, or because in order to evade the judgment of those elders, he has absented himself from the sacrament of the Lord's supper, as is alledged in the paper of the 16th of *Sep- tember?* All persons who become members of a religious society are subject to the discipline of that society. The law permits it, and very wisely, because it tends to the pre- servation of religion and morals. It is understood that ac- cording to the rules of the church to which the plaintiff belongs, if he had really been guilty of infamous falsehoods for which he refused or neglected to make atonement, he might after proper admonition have been excluded from the sacrament of the Lord's supper. Now is it possible that after such an exclusion for such a cause, any man could keep his standing either in the society to which he belongs, or in the world at large? In my opinion he must sink under the opprobrium. I can have no doubt therefore of the mat- ter charged in the declaration being a libel.

Upon the whole my opinion is against a new trial, and against arresting the judgment.

YEATES J. Five reasons have been alledged for this Court's awarding a new trial; two of them only have been insisted upon by the defendant's counsel during the argu- ment.

The first ground taken, that *George Summers,* one of the jurors, had prejudged the cause in favour of the plaintiff before he came to the book to be sworn, does not appear to me to be founded in fact. He has positively denied it upon his oath, and has further sworn that he was wholly ignorant of the cause of action, until it was opened by the plaintiff's

counsel. Previous thereto, he thought it had been some quarrel between the parties about politics. The testimony of *Jonathan Carson* cannot be reconciled with that of *Summers*, being directly contradictory as to the supposed declarations; but charity would induce me to hope, that *Carson's* memory has been defective. We know from experience, that jurors will sometimes make use of finesse to escape from serving in that capacity; but it is perfectly clear that *Summers* alone could know the real state of his own mind antecedently to his being sworn as a juror. Besides, though the defendant here cannot ascertain with precision the time when the supposed declarations of *Summers* were communicated to him, he admits that it must have been previously to the jury's making up their verdict. To intitle him to the advantage of his exception, he should have disclosed the information he had received promptly to the Court. What the judge would have done under that disclosure,—whether he would have confronted the witness and juror, and determined the fact as to the matter of exception,—or whether he would have thought it more eligible to discharge the jurors from giving any verdict, I will not presume to assert; but in this I am very clear, that it would be highly unequal and unreasonable, that the defendant should have two chances, by affirming the verdict if it passed in his favour, but if unfavourable to him, by obtaining a new trial.

The second reason urged in support of a new trial, is that there was a chasm in the testimony adduced by the plaintiff, to prove the defendant's publication of the *Democratic Press* of the 9th of *September* 1808, it being one of the papers charged in the declaration. It is contended that the identity of that paper shown in evidence to the jury was not established, and therefore the same ought not to have been read to them. I readily admit, that in the trial of every suit the *probata* must correspond with the *allegata*, and that the judge usually decides on the conformity of the evidence offered, to the case before him. Should he be of opinion that the testimony proposed is impertinent to the issue then on trial, or does not establish the fact for which it is adduced, he will at once overrule it. But should it be dubious and equivocal in his judgment, if it tends to prove the fact relied on, he may and frequently does submit it to the jury for

1812.

M'CORKLE
v.
BINNS.

1812.

MᶜCORKLE
v.
BINNS.

their decision, with proper instructions to them as to the law arising on the facts as found by them. This subject came before the Court for their deliberate consideration in the *Lancaster* district, upon an appeal from the Circuit Court of *York* county, between the commissioners of *Berks* county and *Ross*. The doctrine is held as I have already laid it down. The judges in delivering their opinions put several cases by way of illustration. Where a deed is offered in evidence, the Court if they please, may decide whether it is sufficiently proved; but they may if they please leave it to the jury to determine on the sufficiency of the proof, and then it is read with proper instructions. So in the case of a receipt supposed to be signed by the plaintiff or his agent, for the whole or part of the sum demanded, the genuineness of which is questioned, and the matter remains doubtful in the mind of the judge, it is more safe and correct to submit the fact to the decision of the jury, than for the judge to determine it himself. I adhere to the opinion which I then delivered, that such a line of conduct is most congenial to our judicial system. 3 *Binn.* 542. 545. Circumstanced as this case was, I think the judge was not bound to reject the testimony offered to prove the publication, and that he did not err in permitting it to go to the jury with proper instructions for the regulation of their conduct. I cannot bring myself to believe that in no case whatever is the comparison of hands evidence. The uniform practice of this Court is directly otherwise.

It has been said, but not insisted upon, that the damages found are excessive. The case certainly is not of that kind, wherein the damages assessed merit that denomination.

As to the matters urged in arrest of judgment, that the publications charged are not libellous, I have no difficulty whatever. Any publication which tends to bring a man into disrepute, ridicule or contempt, is a libel in a legal sense. The distinction between words written or printed and published, and the same words spoken, is clearly settled. *Litera scripta manet.* Charging another with being " deprived of a " participation in the chief ordinance of the church to which " he belonged, by reason of his infamous groundless asser- " tions,"—calling him " a public pest,"—and " distinctly " and decidedly affirming, that he had absented himself from

"the table of the Lord's supper, and thus prevented the "sessions from being called to investigate his conduct," necessarily tend to disgrace a man in society, and make others to shun him. Such charges create ill blood, and manifestly lead to breaches of the public peace. I am well satisfied that such publications are libels, and that judgment upon the verdict be rendered for the plaintiff.

1812.

M'CORKLE
v.
BINNS.

BRACKENRIDGE J. was of the same opinion.

New trial refused, and judgment for plaintiff.