Wilder, J.
The first and second errors assigned are the only ones relied upon in argument by the counsel for the plaintiff in error, and these only is it necessary for us to consider.
1. It is alleged, “ that the court below erred in admitting the testimony of the witnesses, Handy, Eels and Kellogg, as to handwriting, by comparison of hands only.” No question is made as to the admissibility of so much of the testimony of these witnesses, as related to the inquiry, whether the disputed papers were in a disguised or natural hand; nor does it appear that any objection was made in the court below to the proof showing that the papers used as a standard of com parison were in the handwriting of Calkins. The witnesses, Handy, Eels and Kellogg, were called as experts, and had no previous knowledge of the handwriting of Calkins. The disputed papers were exhibited to them, and also certain other writings and letters which had been proved on the trial to be in his handwriting, and they were permitted to testify that upon comparison of the disputed with the proved writing, they believed both were written by the same person. Was this evidence admissible ? It is needless to say that the decisions upon this question have been numerous, both in England and *225 in the United States, and that in the United States, especially, there is great difference of opinion, and different rules have been adopted in different states. In England, New York, Virginia, North Carolina, and perhaps in other states, such evidence is excluded. Starkie, in his Treatise on Evidence, vol. 2, p. 654, says: “ Evidence by comparison of hands is not admissible.” In the case of The People v. Spooner, 1 Denio, 343, Bronson, C.J., in concluding his opinion says: “ The case comes down to the old question, whether a witness can be allowed to give his opinion solely on a comparison of hands, or the juxtaposition of two writings, for the purpose-of ascertaining whether both were written by the same individual. Much has been said, and more might be added, on both sides of this question. But I shall not enter upon the-discussion of it, for the reason that it is settled in this state and in England, that such evidence is not admissible.” The same doctrine was recognized by the supreme court of the-United States, in Strother v. Lucas, 6 Peters’ Rep. 763. “ It is a general rule,” said Thompson, J., delivering the opinion in that case, “ that evidence by comparison of hands is not admissible, when the witness has no previous knowledge of the handwriting, but is called upon to testify merely from a comparison of hands.” Other cases might be cited to the same-effect;
On the other hand, in the states of Connecticut, Massachusetts and Maine, the rule is settled the other way.
The case of Lyon v. Lyman, 9 Conn. Rep. 55, was in several of its features similar to the present. It was an action for libel. The plaintiff offered the testimony of the cashiers-of banks, who had never seen the defendant write, and who had no knowledge of his handwriting, but who had compared the paper in question with other writings proved to be his, and who testified that they were written by the same hand, and that such paper was in a disguised hand. It w7as held, that such cashiers, as persons of skill in their art, were competent witnesses to establish these facts. Judge Dagget, giving the opinion of the court, after citing and briefly examining, many of the authorities upon the subject, with great force of *226 reasoning draws the conclusion that, upon principle, such evidence was admissible.
The supreme court of .Massachusetts, in Moody v. Rowell, 17 Pick. 490, G.J. Shaw, delivering the opinion and fully examining the question, decided, “ that it is competent to call a witness professing to have knowledge in handwriting, and skill in detecting forgeries, to give an opinion to the jury, founded ■on comparison, without any personal knowledge of the actual handwriting of the party whose signature is in controversy.”
Myres v. Toscan, 3 N. H. Rep. 47, is cited by the counsel •on both sides. It was held in that, case, that it could not be left to a jury to determine the genuineness of the signature of a party merely by comparing it with other signatures proved to be genuine; but when witnesses acquainted with the handwriting in question have testified, other signatures proved to ■be genuine may be submitted to the jury to corroborate or weaken the testimony.
In Maine, “ a witness may testify his belief in the genuineness of handwriting, from his acquaintance with the handwriting of the party, whether his acquaintance was gained by having seen the person write, or having received letters from him, or having at any time seen writing either acknowledged ■or proved to be his.” 2 Greenl. Rep. 33.
In South Carolina, it was held, that “ as a circumstance in .aid of doubtful proof, comparison of handwriting was admissible.” Adm’r of Borman v. Plunkett, 2 McCord, 518.
In Pennsylvania, it was decided, that “ evidence from a comparison of handwriting, supported by other circumstances, is admissible.” McKorkle v. Binns, 5 Binn. 340. C.J. Tilghman says, in the same case, p. 349: “ After evidence has been .given in support of a writing, it may be corroborated by comparing the writing in question with other writings, concerning which there is no doubt.” To the same effect, is the case of •.the Farmers’ Bank of Lawrence v. Whiteside, 10 Serg. & Rawle, 110.
In this court, in the case of Hicks v. Person, 19 Ohio Rep. 426, it was decided, “ that when signatures of a party are ^before the court, which are admitted to be genuine, experta *227 may be called to give their opinion, upon comparing them with the signature in controversy, whether it is genuine.”
If, therefore, it be claimed that the weight of authority is against the admission of evidence by comparison of hands, it can not be denied that such evidence has been held to be admissible by many courts of the highest respectability.
But if we turn from an examination of the cases decided, to a consideration of the reasons given for the exclusion of such proof, they fail to .satisfy our minds. The great objection was, the ignorance of the jury — that they might not be able to read, and could not, therefore, make the comparison. To this it would seem a satisfactory answer, that if the'jurors can not read, they may nevertheless receive the evidence of witnesses who can make the comparison. A further answer may be given in Ohio. Our jurors are usually composed of ■educated and intelligent citizens; and however it may have been or now is in England, few men are selected by us as jurors, who are not capable of reading and writing; and it seldom happens that there are not men among them able to form •intelligent opinions by comparison of handwriting.
It is next suggested, that if such comparison were to be allowed, an unfair selection might be made for the purpose of comparison. The samé objection applies, to some extent, when witnesses are called, who testify from their own knowledge, to handwriting. In both cases selections are made most favorable to the party offering them; but all this is open to inquiry and observation.
Mr. Starkie, who approves the exclusion of the evidence, concedes that this is not a satisfactory reason therefor.
A third objection, and of greater weight is, that it would embarrass the trial with numerous collateral issues, and open the door to a great deal of collateral evidence. But all those ■questions which are to be decided by the opinions of witnesses are subject to the same objection. When the papers forming the standard of comparison are already in the case, or are admitted to be genuine, or in the handwriting of the party claimed, the above objection does not apply; and when the jjroof of the standard of comparison is limited as we should *228 be disposed to limit it, to persons who testify directly and' positively to it being made by the party, the inconvenience can never be great. As to the weight to be given to such evidence, it may be greater or less, depending upon the experience and habits of observation of the expert, and other causes. Its importance and value is often great; and looking at its character, it does not seem to us to be inadmissible upon any sound principle. It was well said by Judge Hitchcock in the case of Hicks v. Person, “ that all evidence of handwriting, except where the witness saw the signature made, is derived from comparison.” And “if, as I suppose, every witness who testifies to the handwriting of another, does it by comparing in his mind the signature to be proved with the-knowledge he has previously acquired of the character of the handwriting of the individual, either by seeing him write or by the examination of letters or documents admitted to be his, I can not see any danger'in extending the rule, so far as to permit experts to testify upon actual comparison. Certainly there is more probability of arriving at truth in this manner, than there is in relying upon, the opinion of a witness, who has but in a single instance seen the person write whose signature is to be proven.”
We are of opinion that under the circumstances stated in the bill of exceptions, the court below did not err in admitting the testimony of the witnesses, Handy, Eels and Kellogg.
2. The second error assigned is, that the court.below erred in overruling the motion of the plaintiff in error, in arrest of judgment.
The indictment was for-a violation of the 19th section of the act for the punishment of crimes, passed March 7,1835, and charged the plaintiff in error with stealing bank bills and united States treasury notes. The offense was charged to have been committed on the 19th day of October, 1862. It is claimed by the plaintiff in error, that the said 19th section of the crimes’ act, was repealed by an act of the legislature, passed March 21, 1863, and there being no saving clause in the repealing act, that at the time of his trial there was no *229 law in existence, under and by virtue of which he could be legally tried.
The 18th and 19th sections of the act for the punishment ■of crimes read as follows:
“Sec. 18. That if any person shall steal any money, or •other personal goods or chattels, the property of another, of the value of thirty-five dollars or upward, the person so offending, shall be deemed guilty of larceny, and upon conviction thereof shall be imprisoned in the penitentiary, and kept at hard labor, not more than seven years, nor less than one year.”
“ Sec. 19. That if any person shall steal or maliciously destroy any bank bill or bills, or promissory note or notes, bill of exchange, order, receipt, warrant, draft, check or bond, given for the payment of money, or receipt acknowledging the receipt of money, or any other property of the value of thirty-five dollars or upward, knowing them to be such, every such person shall be deemed guilty of á misdemeanor, and, upon •conviction thereof, shall be imprisoned in the penitentiary, and kept at hard labor, not more than seven years, nor less than ■one year.” S. & C. Stat. 408.
The act of March 21, 1863 (Ohio L. vol. 60, p. 20), is as follows:
“ Sec. 1. Be it enacted by the General Assembly of the State •of Ohio, That section eighteen of an act entitled, ‘ an act providing for the punishment of crimes,’ be amended so as to read as follows:
“ Sec. 18. That if any person shall steal any money, or .goods and chattels of any kind whatever, whether the same be wholly money or wholly in other property, or partly in money and partly in other property, the property of another, of the value of thirty-five dollars or upward; or shall steal or maliciously destroy any money, promissory note, bill of exchange, order, draft, receipt, warrant, check, or bond given for the payment of money, or receipt acknowledging the receipt of money, or other property, of the value of thirty-five dollars or upward, every such person shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be confined in the *230 penitentiary, and kept at hard labor, not more than seven years, and not less than one year: Provided, the word ‘ money’ in this section shall be deemed and taken as including bank bills or notes, United States treasury notes, or other bills, bonds, or notes issued by lawful authority, and intended to pass and circulate as money.”
“ Sec. 2. That sections eighteen and nineteen of the above recited act, be and the same are hereby repealed.”
It will be seen that the said original sections 18 and 19 of the crimes’ act, were both materially changed by the amendatory and repealing act of March 21,1863. By the provisions-of 'the last-mentioned act, to make up the value of thirty-five dollars, money and property stolen at the same time may be added together, which could not have been done before, or at least bank bills and property could not be so added. 11 Ohio St. Rep. 322. And in the new enactment the words “ knowing them to be such,” contained in section 19, are omitted, and United States treasury notes, or other bills, bonds or notes-issued by lawful authority, and intended to circulate as money, are brought within its provisions. By section 2 of said act of March 21, 1863, said sections 18 and 19 are repealed without any saving clause.
It is claimed by the plaintiff in error, that such a repeal, though it takés place after conviction, arrests the judgment; and that the statute repealed must be considered, except as to-transactions passed and closed, as if it had never existed. Butler v. Palmer, 1 Hill, 324; Key v. Goodwin, 4 Moore &. Payne, 341, 351 (6 Bingham, p. 576); Dwarris on Stat. 676 (Law Library, vol. 7, p. 32); and Hartung v. The People, 8 Smith (22 N. Y. Court of Appeals); are cited in support of this proposition, and they fully sustain it.
Sir Matthew Hale, in his history of the Pleas of the Crown, says, “ that when an offense is made treason or felony by anací of parliament, and then those acts are repealed, the offenses committed before such repeal, and the proceeding thereupon-are discharged by such repeal, and can not be proceeded upon-after such repeal, unless a special clause in the act of repeal be made, enabling such proceeding, after the repeal, for *231 offenses committed before the repeal.” Hale’s Pleas of the Crown, vol. 1, p. 291.
It is believed that the doctrine thus laid down by Lord Hale has been adhered to both in England and in this country.
In Key v. Goodwin, cited as above stated, by the counsel for the plaintiff in error, Lord C.J. Tindal, says: “ I take the effect of repealing a statute to be, to obliterate it as completely from the records of the parliament as if it had never passed: and it must be considered as a law that had never existed, except for the purpose of those actions which were commenced, prosecuted and concluded while it was an existing law.” And in Surtees v. Ellison, 9 Barn. & Cress. 720, Lord C.J. Tenterden lays it down as a general rule, and says, that “ it has long been established, that when an act of parliament is repealed, it must be considered (except as to transactions passed and closed) as if it had never existed. ” And he adds, that we must not destroy this rule, “by indulging in conjectures as to the intention of the legislature.”
Hartung v. The People is a recent case decided by the court of appeals of New York. This question was then thoroughly examined, and ably considered. Many American as well as English authorities are cited by Denio, J., in delivering the opinion of the court: all to the effect above stated. The law as laid down by Lord Hale, he says, has been steadily adhered to in England and in the United States, and he correctly adds, that in several of the cases which have been adjudged, the immunity extended to the offender was the result of accident or inadverténce. It was apparent, that if the thought had occurred to the lawmakers, a saving clause as to existing offenses, and especially as to prosecutions which had taken place, would have been added.
This general proposition, indeed, is not controverted by the state, but it is claimed that for several reasons the case at bar does not fall within its operation:
First. Because it is apparent upon the face of the act of March 21, 1863, that the legislature did not intend to change the crime, or the punishment consequent upon it, of which the plaintiff in error was convicted. That it is a rule *232 of interpretation, of penal as well as other statutes, that the whole statute must be considéred, and such construction given to it as is reasonable, and, if possible, will not prejudice existing rights of the people or of individuals; that other legislation upon the same question may be looked at; that the effect and consequences may be taken into account; and that the manifest intention of the legislature should control the literal meaning of the language employed. Debolt v. The Ohio Life Insurance and Trust Company, 1 Ohio St. Rep. 563, is cited in support of these views.
Without questioning the correctness of these rules of interpretation," it may be replied that when the legislature use the usual and ordinary language employed to express a frequent purpose, and that language is clear and precise, there should be • given to it its usual and plain meaning. There is no room for construction, or, at least, for any other construction. Judge Ranney, in delivering the opinion of the court in the case cited, says, “ whether the repeal of a statute is absolute or modified, is always a question of legislative intention, and the legislature will not be presumed to have intended an absurd or unjust consequence.” “ But,” he adds, “ the language, if clear, must govern.”
In reference to this legislation, it would be more correct to say, that the legislature did not contemplate the consequences of the repeal, as they enacted it, than that they intended to save prior offenses and pending prosecutions. It was doubtless an inadvertency; but that inadvertency we can neither supply nor correct.
It is, in the second place, claimed that the &„t of April 8, 1856, extends to criminal statutes. That act is entitled “an act concerning the enacting and repealing of statutes.” 4 Cur-wen’s St. 2199. The second section reads as follows : “That whenever a statute is repealed, such repeal shall in no manner affect pending actions founded thereon, nor causes of action not in suit, that accrued prior to any such repeal, except as may be provided in such repealing statute.”
It is said that this statute is to be so considered, first, for the reason that its title denotes its general character, and as *233 •intending to include all statutes; and, secondly, because criminal statutes are within its policy — to guard against the effects •of carelessness, inattention or haste in the repeal of existing laws. But its title is sufficiently appropriate, if the statute be held to be of a more limited character; and will it be presumed that the legislature would anticipate that, in matters of so much importance, as defining and providing for the punishment of crimes of the first class, there would be legislation so careless, or hasty ? It is scarcely probable that they would have so judged; but if prosecutions for crime had been in their minds, and they had so intended, is it not almost certain that they would have used the ordinary and appropriate language, to manifest such intention, adding the words, “ or prosecutions,” and “or offenses before committed?”
Thirdly. It is contended, that the term “actions,” in its appropriate and legal signification, includes criminal prosecutions founded on penal statutes. Tomlin’s ed. Jacob’s Law Die. vol. 1, p. 30, title, Action; Bacon’s Abr., Action A; 2 Burril’s Law Die., vol. 1, p. 65, are cited in support of this proposition.
It is true that the above writers describes “ actions,” as divided into criminal or civil; and it may formerly have been used in its most general sense, embracing criminal prosecutions and civil suits; but such is not the more modern use of the term. Criminal actions are called in the constitution prosecutions,” and our laws provide civil remedies by action. No instance has been brought to our attention, nor does any one occur to me, where in our constitution, laws, or elementary treatises, the word action is so used as to show a clear intention to include within its meaning criminal prosecutions. It is apparent also that “ action,” as used in the statute in the two clauses, “ pending actions,” and “ causes of action not in suit,” is used in precisely the same sense; and it would hardly be contended that the expression “causes of action not in suit” should be understood as meaning to include offenses not prosecuted by indictment. We think that “action” in the statute, is used in its ordin?ry sense, as meaning, simply, civil actions; and that the act cf April 8, 1856, does net extend to *234 prior offenses, or prosecutions pending at the time of its enactment.
We are of opinion, therefore, that the court below erred in not arresting the judgment in accordance with the motion of the plaintiff in error.
The judgment of the court of common pleas is reversed, and the prisoner discharged.
Peck, C.J., and Brinkerhoef, Scott and Ranney, JJ., concurred.